225 N.J. Super. 547 (1988)
543 A.2d 80
DALE G. POTTER, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
VILLAGE BANK OF NEW JERSEY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, AND EM KAY HOLDING CORPORATION, A NEW JERSEY BANK HOLDING COMPANY, DEFENDANTS-APPELLANTS, CROSS-RESPONDENTS, MORY KRASELNICK, DEFENDANT-CROSS-RESPONDENT, NEW JERSEY DEPARTMENT OF BANKING, INTERVENOR, AND ALLAN M. BART, MOISES KROITORO, EM KAY, INC. AND EM KAY FINANCING CORP., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 25, 1988.
Decided June 9, 1988.
*549 Before Judges J.H. COLEMAN, O'BRIEN and STERN.
Brian N. Lokker argued the cause for appellants, cross-respondents (Williams, Caliri, Miller & Otley, attorneys).
Bernard F. Conway argued the cause for respondent, cross-appellant (Giblin, Combs, Cooney & Conway, attorney; Catherine M. Langlois of counsel and on the brief).
Barbara S. Goldsmith, Deputy Attorney General, argued the cause for intervenor (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Barbara S. Goldsmith on the brief).
The opinion of the court was delivered by J.H. COLEMAN, P.J.A.D.
*550 The crucial question raised in this appeal is whether a bank president and chief executive officer who blows the whistle on suspected laundering of Panamanian drug money is protected from retaliatory discharge by the public policy of this State. We answer in the affirmative. We also hold that the retaliatory discharge in this case constituted an intentional tort which exposed defendants to compensatory and punitive damages. We affirm the judgment.

A
Plaintiff Dale G. Potter became the president and chief executive officer of the Village Bank of New Jersey (Village Bank) on November 15, 1982. His employment was terminated in May or June 1984. On June 13, 1984 plaintiff filed a complaint in the Chancery Division against Village Bank alleging that his job had been wrongfully terminated. Plaintiff sought reinstatement to his position as chief executive officer and president of the bank.
The same day, the Chancery Judge issued an order to show cause with temporary restraints which required Village Bank to continue paying plaintiff's salary and other benefits. By order of June 27, 1984 the bank was required to pay plaintiff's salary and benefits until November 15, 1984, the termination date under plaintiff's employment contract. The Chancery Judge transferred the case to the Law Division.
After the matter was transferred to the Law Division, plaintiff filed an amended complaint against Village Bank, Mory Kraselnick, Allan Bart, Moises Kroitoro, Em Kay Inc., Em Kay Holding Corporation and Em Kay Financing Corporation. In the four-count amended complaint plaintiff sought compensatory and punitive damages based on (1) fraudulent inducement, (2) breach of contract, (3) tortious interference with the employment relationship and (4) wrongful termination.
*551 The case was tried to a jury over a four-day period. During trial, plaintiff voluntarily dismissed the case against Bart, Kroitoro, Em Kay Inc. and Em Kay Financing. At the end of plaintiff's case, the trial judge granted defendants' motion for involuntary dismissal of plaintiff's claims of fraudulent inducement, breach of contract and wrongful interference with the employment relationship. The only remaining claim was for wrongful discharge. The trial judge held that Kraselnick was not named as a defendant in the count alleging wrongful discharge and dismissed the complaint against him.
The claim of wrongful discharge was submitted to the jury as to the remaining defendants, Village Bank and Em Kay. The jury answered the following special interrogatories:
Q1. Did the Defendants wrongfully discharge the plaintiff?
A. Yes.
Q2. Was the plaintiff damaged by such wrongful discharge?
A. Yes.
Q3. What amount of compensatory damages, if any, should the plaintiff be awarded for such wrongful discharge?
A. $50,000.
Q4. What amount of punitive damages, if any, should the plaintiff be awarded for such wrongful discharge?
A. $100,000.
After the trial judge denied defendants' motion for judgment notwithstanding the verdict, final judgment was entered in the sum of $162,575.40, which consisted of $100,000 in punitive damages, $50,000 in compensatory damages plus $12,575.40 in prejudgment interest on the compensatory damages.
Village Bank and Em Kay Holding Corporation have appealed from the entire judgment. Plaintiff has cross-appealed from the involuntary dismissals at the end of plaintiff's evidence.
The pivotal issue presented to the jury was whether plaintiff resigned or was discharged in violation of a clear mandate of public policy. Based on the evidence presented, the jury concluded he was fired contrary to a clear mandate of public policy. The following evidence supports that finding. Em Kay Holding Corporation (Em Kay) owns 93% of the stock of Village Bank. *552 The remaining 7% is distributed among other shareholders. Em Kay is owned by the Em Kay Group which has its headquarters in Panama City, Panama. Em Kay Group is owned by Mory Kraselnick and Moises Kroitoro.
Bart and Kraselnick negotiated with plaintiff for employment at Village Bank. In September 1982 when the president of Village Bank suffered a heart attack, plaintiff was offered and accepted a position with the bank as a "holding company consultant." Plaintiff became president and chief executive officer of Village Bank two months later. Between then and January 1983, Kraselnick frequently telephoned plaintiff to request that Village Bank make large loans to companies that did business with Kraselnick and companies owned by Kraselnick. With few exceptions, plaintiff refused these requests.
After a January 21, 1983 meeting Kraselnick told plaintiff: "[I]f I ever ask you to do anything wrong, I'll stand up in front of you." At the time, plaintiff did not understand the meaning of the statement. Over the next couple of months, however, many cash deposits of between $8,000 and $9,300 were made into the accounts of Kraselnick, Bart, Noel Kinkella (office manager of Em Kay Equities whose president was Bart) and several of the companies in the Em Kay Group.
On March 24, 1983 plaintiff learned that Village Bank was advertising his job in the Wall Street Journal. When plaintiff confronted Kraselnick about this, he was told "You're not as outspoken and enthusiastic as I want you to be when you meet me." After plaintiff defended his position, the two temporarily reconciled.
On March 31, 1983 Kinkella went to Village Bank with a shopping bag filled with money. She made seven $9,000 deposits to accounts held by Kraselnick, Bart, Kinkella and four Em Kay related companies. Plaintiff became suspicious that drug money was being laundered so he called the New Jersey Commissioner of Banking and reported the transactions and requested advice. Before plaintiff could meet with the Commissioner, *553 Kinkella deposited another package of about $50,000 in cash. When plaintiff asked Bart about the money, Bart told him that it was for lease payments between two related aeronautical companies in the Em Kay Group. Plaintiff became more suspicious that the large cash deposits were related to laundering of Panamanian drug money. When the Commissioner eventually met with plaintiff, he told plaintiff to maintain anonymity and that a full investigation would be undertaken. The jury was not informed about the details of plaintiff's suspicions.
Audits of the bank were conducted starting around the end of April or the beginning of May 1983. On June 28, 1983 plaintiff advised Village Bank's board of directors of the examination, but not of his meeting with the Commissioner. In July 1983 plaintiff filed currency transaction reports with the Department of the Treasury reporting the cash deposits.
In September 1983 Village Bank's board of directors raised plaintiff's salary from $65,000 to $75,000. Kraselnick also offered plaintiff a $10,000 bonus in cash so he "wouldn't pay income taxes" on it. When plaintiff refused to accept the bonus in cash, the bonus was not paid. In December 1983 the United States Attorney's Office for New Jersey issued subpoenas to the bank for the production of documents "on a list of accounts" related to the Em Kay Group. Plaintiff was also interviewed by representatives from that office.
On January 6, 1984 plaintiff executed his first written employment contract with Village Bank. The term was for one year beginning November 15, 1983. The contract provided for a base salary of $75,000, with a bonus at the discretion of the board of directors.
At some time between July and December 1983, plaintiff told Steven S. Radin, secretary to the Village Bank board of directors, that he "had gone to the Commissioner and reported the [cash] transactions." In January 1984 Radin informed Bart and Kraselnick of what plaintiff had told him. This angered *554 Kraselnick. At the next scheduled board meeting, the directors were informed.
Immediately after the board meeting, Kraselnick asked plaintiff why he went to the Commissioner of Banking. When plaintiff responded "I thought that it was drug money," Kraselnick stated "you're probable right." From that point on, plaintiff contended that he was isolated from running the bank effectively since his subordinates in the bank were ordered not to talk to him. Further, there were several instances where Kraselnick questioned plaintiff's judgment and accused him of doing things incorrectly.
Plaintiff testified that Radin and at least two of Village Bank's directors advised him that he was about to be fired before plaintiff wrote a letter on May 22, 1984. The letter was written to Kraselnick which stated in pertinent part:
I wanted to be able to communicate directly with you and since my requests for a face to face meeting with you have been rejected, I am using this as my only recourse. At this point in time, I am considering myself "de facto" fired since Allan Bart has told several directors and John Bjerke, among others, that "Potter's gone" and in turn at least one director has communicated the same to several customers who have even discussed it with people in the Bank including myself. Needless to say, the lack of discretion in discussing this situation in this way can only serve to hurt the Bank and the people in it. However, it has been done and the effect of it, in my opinion, has been that I consider myself at this point in time essentially to be terminated only without the pre-requisite action of the Board of Directors.
Shortly after the letter was written, plaintiff told members attending a board meeting that the letter was not intended as a letter of resignation. He reiterated this point in a May 31, 1984 letter to Radin.
By letter dated June 1, 1984, Radin notified plaintiff that
... it was the consensus of the Board that the Bank pay you full salary until the termination (November 15, 1984) of your present contract. During that period of time you would have the use of a car, office and secretarial assistance. Also you would receive all ordinary employee benefits. In consideration of these severance terms the Board requested a general release from you for the Bank, its directors and officers. The Board gave you until June 1, 1984 to accept or reject this offer. From May 24, 1984 until June 1, 1984 you were placed on leave of absence with pay.
*555 Plaintiff rejected the proposal made by the board. When plaintiff attempted to attend a June 11 board meeting with his attorney, the board asked him to leave the bank.

B
Defendants contend that N.J.S.A. 17:9A-112 of the Banking Act of 1948 (N.J.S.A. 17:9A-1 et seq.) permits Village Bank's board to terminate the employment of its president with or without cause, and that an "action for wrongful discharge does not lie." They therefore allege that the judge should have dismissed the claim of wrongful termination.
In response, plaintiff argues that defendants are procedurally barred from asserting any defense to the plaintiff's discharge on the basis of N.J.S.A. 17:9A-112 because it was not raised below. It is clear from the record that defendants contended that the termination of plaintiff's employment was not violative of public policy. They did not raise the statute as a defense before or during trial. Further, plaintiff contends that the bank was not entitled to discharge him in violation of public policy notwithstanding N.J.S.A. 17:9A-112, which provides:
Subject to removal by the board of directors at its pleasure, ... each officer shall hold office from the time of his election or appointment until the first meeting of the board of directors, following the next annual meeting of stockholders, at which officers are elected or appointed. [Emphasis added].
It is well settled that appellate courts may decline to consider issues not fully presented at trial unless the issues are jurisdictional or concern matters of great public importance. Matter of Board of Educ. of Town of Boonton, 99 N.J. 523, 536 (1985), cert. den. 475 U.S. 1072, 106 S.Ct. 1388, 89 L.Ed.2d 613 (1986); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). This is also true of defenses not raised below. Meglino v. Tp. Committee of Eagleswood Tp., 197 N.J. Super. 296, 302 (App. Div. 1984), rev'd on other grounds, 103 N.J. 144 (1986); Mancuso v. Rothenberg, 67 N.J. Super. 248, 257 (App.Div. 1961); Battaglio v. Red Bank Discount Center, Inc., 65 N.J. Super. 185, 187-188 (App.Div. 1961), certif. den. 34 N.J. 469 (1961).
*556 Clearly, a defense to a wrongful discharge claim based on N.J.S.A. 17:9A-112 does not involve a jurisdictional matter. But we think there is considerable public interest in settling whether our public policy condones the firing of a bank president who blows the whistle on directors of a bank who are suspected of laundering drug money. See Nieder v. Royal Indem. Ins. Co., supra; Deerfield Estates, Inc. v. East Brunswick Twp., 60 N.J. 115, 120 (1972). Hence, we will reach the merits of the controversy. Also see Riggs v. Township of Long Beach, 101 N.J. 515, 521 (1986), on remand 212 N.J. Super. 69 (App.Div. 1986), rev'd 109 N.J. 601 (1988) respecting the time of decision rule.
The only case construing N.J.S.A. 17:9A-112 was decided one month after the trial in the present case ended. In Citizens State Bk. of N.J. v. Libertelli, 215 N.J. Super. 190 (App.Div. 1987), we held that the statute converted a bank president's contract of employment into at-will employment. Id. at 194. We also held that public policy did not impose liability for discharging a bank president who insisted on following sound and lawful banking practices and would not go along with the self-dealing improprieties of board members. Id. at 195-196.
Libertelli must be read narrowly. Unlike the present case, Libertelli did not seek damages based on an alleged retaliatory discharge. He sought damages based on breach of contract, fraud and libel. He also argued that his termination violated public policy. We dismissed the contract theory and the fraud claim which was based on nonperformance of the unenforceable contract. In addition, we rejected the public policy argument stating
[t]ermination of a bank officer for protesting directors' improprieties is not barred by public policy arising from a regulatory scheme which specifically permits the termination and contains effective other means of dealing with those improprieties. [215 N.J. Super. at 196; emphasis added].
N.J.S.A. 17:9A-112 was enacted in 1948 (L. 1948, c. 67, § 112), and has not been amended since. Under the common law at that time, an employer had the "unbridled authority to discharge, *557 with or without cause, an employee in the absence of contractual statutory restrictions." English v. College of Medicine and Dentistry of N.J., 73 N.J. 20, 23 (1977). An employee serving at the pleasure of the board of directors therefore had no recourse against the board of directors when he was fired.
In Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72 (1980), however, the Court for the first time in New Jersey held that even an employee at will has a cause of action for wrongful discharge "when the discharge is contrary to a clear mandate of public policy." Thereafter, our courts have found mandates of public policy under varying circumstances. In Lally v. Copygraphics, 85 N.J. 668, 671 (1981), a retaliatory discharge upon filing of workers' compensation claim violated a statutorily expressed public policy. There, the Court concluded that "retaliatory discrimination `by an employer constitutes both a public and a private wrong, each of which is entitled to vindication.'" Thus, the Court held that although there was a statutory remedy for a retaliatory discharge based on the filing of a workers' compensation claim, the retaliatory discharge also violated public policy which permitted the filing of a retaliatory discharge tort claim.
Similarly, in Kalman v. Grand Union Co., 183 N.J. Super. 153, 159 (App.Div. 1982), we held that the discharge of a pharmacist for refusing to close the pharmacy on July 4 violated public policy. In Giudice v. Drew Chemical Corp., 210 N.J. Super. 32, 36 (App.Div. 1985), certif. granted in part and remanded, 104 N.J. 465 (1986), we recognized the existence of a public policy protecting at will employees who cooperate with law enforcement officials investigating fellow workers. More recently our Supreme Court recognized that a cause of action exists for a retaliatory discharge of an at will employee for requesting information relevant to suspected gender-based employment discrimination. Velantzas v. Colgate-Palmolive Company, Inc., 109 N.J. 189, 191-192 (1988).
*558 It is now apparent that Pierce does not require an at will employee's claim of retaliatory discharge to be based on a specific statute which proscribes a particular type of discharge. Rather, an employer's obligation to refrain from discharging an employee who reports suspected criminal activities to law enforcement officials reflects a duty imposed upon all employers including banks  in order to implement the fundamental public policies embodied in the State and federal penal statutes.
Libertelli's finding that no public policy was violated in the firing of the bank president is not controlling in the present case. In Libertelli the bank president was not a whistle blower; he simply refused to go along with the self-dealing improprieties of board members. In the present case, the jury found that the bank president was terminated because he reported to the New Jersey Commissioner of Banking that the board members may have been engaged in a conspiracy to violate the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 et seq. and 31 C.F.R. §§ 103.22 and .26.
Subsequent to the trial in this matter Kraselnick, Bart, Bjerke and Village Bank were indicted by a federal grand jury for the District of New Jersey for allegedly conspiring to defraud the United States and making fraudulent statements in violation of 31 U.S.C. § 5311 et seq., 31 C.F.R. § 103.22 et seq., and 18 U.S.C. §§ 371, 1001 and 1002. The alleged criminal violations are based on their failure to report large cash transactions at Village Bank during the time Potter was president and chief executive officer.
31 U.S.C. § 5313(a) provides, in pertinent part:
(a) When a domestic financial institution is involved in a transaction for the ... receipt ... of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.
*559 Pursuant to this authority, the Secretary of the Treasury promulgated regulations which mandate the reporting of transactions in currency of more than $10,000. 31 C.F.R. § 103.22(a).
Because the deposits in this case were slightly less than $10,000, plaintiff was not required by the strict wording of the statute and regulations to report the cash transactions. However, there is existing authority holding that a bank officer may not structure a single transaction in currency as multiple transactions to avoid the reporting requirements. A financial institution must aggregate all transactions by one customer in one day. United States v. Bank of New England, 821 F.2d 844, 849-850 (1st Cir.1987), cert. den. ___ U.S. ___, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987); United States v. Thompson, 603 F.2d 1200, 1203 (5 Cir.1979); see 52 Fed.Reg. 11, 436 (Apr. 8, 1987) amending 31 C.F.R. § 103.22(a). Cf. United States v. Gimbel, 830 F.2d 621, 625-626 (7 Cir.1987).
Unlike the facts in Libertelli, Potter did much more than "protest [] [the] directors' improprieties" relating to a regulatory scheme. He blew the whistle on suspected criminal conduct involving one or more directors. Hence, Potter's termination relates to the public policy designed to encourage citizens to report suspected criminal violations to the proper authorities in order to ensure proper enforcement of both state and federal penal laws. See Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 610 P.2d 1330, 1335, 164 Cal. Rptr. 839, 844 (1980). Pierce draws no distinction between public policy emanating from enforcement of legislation, administrative rules, regulations or decisions and judicial decisions. Pierce, supra, 84 N.J. at 72. Nowhere in our society is the need for protection greater than in protecting well motivated citizens who blow the whistle on suspected white collar and street level criminal activities. If "no person can lawfully do that which has a tendency to be injurious to the public or against the public good" because of public policy, Allen v. Commercial Casualty Insurance Co., 131 N.J.L. 475, 477-478 (E. & A. 1944), surely *560 whistle blowers of suspected criminal violations must be protected from retaliatory discharge. It stands to reason that few people would cooperate with law enforcement officials if the price they must pay is retaliatory discharge from employment. Clearly, that would have a chilling effect on criminal investigations and law enforcement in general.
Additionally, after plaintiff's employment was terminated, the Legislature enacted the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. See L. 1986, c. 105, § 1, effective September 5, 1986. Under the act, an employee who has been terminated because of reporting suspected criminal violations, has the right to file a retaliatory tort claim in addition to other remedies. N.J.S.A. 34:19-3. We read this legislative enactment as a codification of public policy established through judicial decisions. Even if the Conscientious Employee Protection Act were controlling in this case, plaintiff would not be excluded from its protection by virtue of N.J.S.A. 34:19-4. The fact that each cash deposit was kept below $10,000 is a clear indication that the depositors were aware of 31 C.F.R. §§ 103.22 and .26. Contrary to defendants' assertion, plaintiff would not have been required under N.J.S.A. 34:19-4 to first advise board members of the suspected violations before reporting the suspected violations to Commissioner Horn.
We hold that the public policy of the State of New Jersey should protect at will employees  including bank presidents  who in good faith blow the whistle on one or more bank directors suspected of laundering money from illegal activities. This policy is embodied in 31 U.S.C. § 5311 et seq., 31 C.F.R. §§ 103.22 and .26 and 18 U.S.C. §§ 371, 1001, which require banks and directors to report certain cash transactions. Congress required the reporting as an aid to criminal, tax or regulatory investigations. 31 U.S.C. § 5311; California Bankers Ass'n v. Shultz, 416 U.S. 21, 37-38, 63-78, 94 S.Ct. 1494, 1505-1506, 1519-1525, 39 L.Ed.2d 812, 826-827, 841-850 (1974). By firing plaintiff for reporting these cash transactions, Village Bank violated the public policy implicit in 31 U.S.C. § 5311 et *561 seq., 31 C.F.R. §§ 103.22 and .26 and 18 U.S.C. §§ 371, 1001. Based on our review of the evidence presented, we find sufficient credible evidence to support the jury's finding that plaintiff established a retaliatory discharge from employment in violation of a clear mandate of public policy.

C
Defendants further contend that since plaintiff "incurred no monetary damages," the jury should not have been entitled to award him compensatory damages.
Pierce permits a wrongfully terminated employee to maintain a cause of action which sounds in contract or tort or both.
An action in contract may be predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy.
An action in tort may be based on the duty of an employer not to discharge an employee who refused to perform an act that is a violation of a clear mandate of public policy. In a tort action, a court can award punitive damages to deter improper conduct in an appropriate case. That remedy is not available under the law of contracts. [84 N.J. at 72-73].
As previously noted, plaintiff's amended complaint sounded in contract and tort. Because the jury awarded both compensatory and punitive damages, the wrongful termination claim submitted to the jury sounded in tort. See Lepore v. National Tool and Manufacturing Company, 224 N.J. Super. 463, 473 (App.Div. 1988). Lepore identifies the wrongful discharge in this case as a retaliatory discharge tort. Even though the jury instructions did not refer to it as such, we must decide whether the compensatory damages were excessive as tort damages. See also Jackson v. Consolidated Rail Corp., 223 N.J. Super. 467, 482-483 (App.Div. 1988). The jury was instructed that plaintiff was entitled to be compensated for the actual losses incurred as a direct result of the alleged wrongful termination.
Our research has not uncovered any reported New Jersey decision containing a detailed discussion of the measure of compensatory damages recoverable for a retaliatory discharge *562 tort. But see Woolley v. Hoffman-La Roche, Inc., 99 N.J. 284, 308, judgment modified 101 N.J. 10 (1985); Lally v. Copygraphics, 173 N.J. Super. 162 (App.Div. 1980), aff'd 85 N.J. 668 (1981). We perceive no valid reason why the measure of damages should be different than for other torts. Generally, compensatory damages are designed to put the injured party in as good a position as he would have been in had the tortious conduct not occurred. 525 Main Street Rop. v. Eagle Roofing Corp., 34 N.J. 251, 254 (1961). Evidence affording a basis for estimating damages with some degree of certainty is sufficient to support an award of compensatory damages. Amer. Sanitary Sales v. Purchase & Prop. Div., 178 N.J. Super. 429, 435 (App.Div. 1981), certif. den. 87 N.J. 420 (1981). Here, we must decide the measure of compensatory damages.
We hold that an at will employee who has sustained a retaliatory discharge in violation of a clear mandate of public policy is entitled to recover economic and noneconomic losses. Such an employee may recover (1) the amount he or she would have earned from the time of wrongful discharge for a reasonable time until he or she finds new employment, including bonuses and vacation pay, less any unemployment compensation received in the interim, Annotation, "Damages Recoverable For Wrongful Discharge of At-Will Employee," 44 A.L.R. 4th 1131, 1137 (1986); (2) expenses associated with finding new employment and mental anguish or emotional distress damages proximately related to the retaliatory discharge, Smith v. Atlas Off-Shore Boat Service, Inc., 653 F.2d 1057, 1064 (5 Cir.1981), on remand 552 F. Supp. 128 (S.D.Miss. 1982); Ness v. Hocks, 272 Or. 210, 536 P.2d 512 (1975); and (3) the replacement value of fringe benefits such as an automobile and insurance for a reasonable time until new employment is obtained. See Maddaloni v. Western Mass. Bus Lines, Inc., 386 Mass. 877, 438 N.E.2d 351 (1982). Plaintiff made no claim for mental anguish, emotional distress or other noneconomic damages.
*563 Under the evidence presented, plaintiff was entitled to collect compensatory damages due to unemployment from November 15, 1984  when the compensation ordered by the Chancery Judge ended  until early March 1985 when plaintiff became re-employed. Plaintiff was unemployed for 16 weeks at his $75,000 salary, entitles him to $23,076.96. He testified that he received $2,000 in unemployment compensation. That leaves a net wage loss of $21,076. In addition, plaintiff testified that: (1) he was entitled to five weeks of vacation time for 1984, worth $7,200, and that if he had worked at all in 1985, he would have been entitled to another five weeks of vacation pay; (2) he was not paid a $10,000 bonus promised for 1984; (3) he lost the use of an automobile and insurance worth $600 a month which amounts to $2,215 for 16 weeks; and (4) he spent $7,800 searching for another job. These are proper items of damages which total $55,491.
The jury awarded $50,000 in compensatory damages. In addition, the jury awarded $100,000 in punitive damages. We are completely satisfied that both the compensatory and punitive damages awarded are supported by sufficient credible evidence and were consonant with the law. Justice v. Weise, 14 N.J. Super. 9, 13 (App.Div. 1951). By the same token, the damages awarded do not represent a miscarriage of justice under the law. R. 4:49-1(a); Baxter v. Fairmont Food Co., 74 N.J. 588, 596 (1977). The award of exemplary damages was intended to punish the defendants for their egregious conduct. Fischer v. Johns-Manville Corp., 103 N.J. 643, 657 (1986); Cappiello v. Ragen Precision Indus., Inc., 192 N.J. Super. 523, 527-528 (1984).
We have considered the remaining issues raised by defendants as well as the issues raised in the cross-appeal and find they are clearly without merit. R. 2:11-3(e)(1)(A), (B), (C) and (E). We affirm the judgment for plaintiff and dismiss the cross-appeal.