935 A.2d 825 (2007)
396 N.J. Super. 582
Talib TURNER, Plaintiff-Appellant,
v.
ASSOCIATED HUMANE SOCIETIES, INC. and Roseann Trezza, individually and in her official capacity, Defendants-Respondents, and
Terrence D. Clark, individually and in his official capacity, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 2007.
Decided November 30, 2007.
*827 Katherine D. Hartman, Moorestown, argued the cause for appellant (Attorneys Hartman, attorneys; Ms. Hartman, on the brief).
Harry J. Levin, Toms River, argued the cause for respondents (Levin Cyphers, attorneys; Mr. Levin and Colleen F. Cyphers, on the brief).
Before Judges PARRILLO, SABATINO and ALVAREZ.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiff Talib Turner appeals from an order of the Law Division dismissing his *828 cause of action under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and granting a directed verdict, pursuant to Rule 4:37-2(b), in favor of defendants Associated Humane Societies, Inc. (AHS) and Roseann Trezza at the close of plaintiff's evidence. For the following reasons, we reverse and remand for a new trial.
Accepting as true all the evidence adduced by plaintiff on his case-in-chief, and according him the benefit of all favorable inferences, Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969), the facts are as follows. AHS is a federally and state recognized Section 501(c) nonprofit organization that receives, shelters, and adopts homeless and unwanted animals out to the public. It also performs other animal-related services, such as euthanasia, public education, and animal control for municipalities throughout the State. AHS has various shelters throughout New Jersey, including facilities in Newark, Union,[1] Tinton Falls and Forked River. Defendant Roseann Trezza is the executive director of AHS, and Terrence Clark is the assistant executive director.
Plaintiff was hired by AHS as an at-will employee on August 19, 2003, to work in its Newark facility. Plaintiff's duties were essentially clerical and included inputting data into the computer, processing paperwork for animal surrenders and adoptions, answering the telephone, and client contact.
On June 1, 2003, about two-and-one-half months before plaintiff started working at AHS, Renee Langhaar surrendered her 115-pound dog, a Doberman Pinscher, to AHS's Newark facility for destruction. The dog was being surrendered because it had bitten Langhaar and that fact was noted on AHS's animal detail form known as a "Nine." Langhaar paid AHS approximately $205 to keep the dog under observation for ten days, then euthanize, and cremate it.
Contrary to its agreement with Langhaar, AHS never put the dog to sleep, but rather placed it back into the pool of adoptable animals. On August 27, 2003, about one week after plaintiff started working at AHS, the Doberman that was to have been destroyed was adopted out to Valerie deSwart, an elderly woman, who had come to the shelter that day from Medford. While processing the paperwork for deSwart's adoption of the Doberman, plaintiff noticed a notation on the "Nine" that the dog had bitten its prior owner, and the prior owner had actually paid AHS to euthanize the dog after the ten-day observation period expired, which would have been June 8, 2003. Concerned about this discrepancy, plaintiff immediately notified his supervisor, Sam "Lovey" McCloud. When Lovey told deSwart she could not adopt the dog, presumably because it had attacked its previous owner and was supposed to be euthanized, she requested that he confirm with a higher authority.
As a result, Lovey called Trezza in plaintiff's presence to explain the situation, which resulted in Trezza approving the Doberman's adoption. Her approval only heightened plaintiff's concerns because of his knowledge of the Doberman breed. He had previously watched a Discovery channel segment on television warning the dog could snap and turn on its owner because a Doberman's brain can grow faster than its skull. Plaintiff also was warned about Dobermans by a friend who raises dogs. Consequently, plaintiff decided to call Trezza back. He personally dialed her extension, handed the phone to Lovey and *829 then listened in on the conversation. At plaintiff's urging, Lovey explained plaintiff's concerns to Trezza, namely that the dog had bitten its previous owner who then paid AHS to euthanize the animal. Trezza, however, confirmed her earlier decision allowing the adoption: "[h]e has to do it. I approved it. That's his job." When Trezza inquired whether plaintiff was also on the phone, plaintiff responded "I'm right here."
The order to adopt the dog out "shock[ed]" plaintiff but Lovey told him, "you've got to do it", and plaintiff reluctantly complied. As he later explained:
I had to do my job. I still told Lovey that I ain't feel comfortable with doing the job. But I'm new, that's my boss, my boss telling me to do that job, that's what I had to do.
Thus, plaintiff proceeded to complete the adoption process. As required by AHS, plaintiff checked the dog's temperament and observed deSwart walking with the dog outside before allowing her to leave with the animal. Trezza and her assistants also observed the two with each other, a procedure they do not typically perform.
Nine days later, on September 7, 2003, the Doberman attacked deSwart at her home, causing her to bleed to death on her bedroom floor. When plaintiff heard of this the next day at work, he told Lovey, "I told you all. I tried to tell you all." Lovey simply replied that he had "nothing to do with it." That same day, September 8, 2003, while at work, plaintiff was called into a conference with Trezza, Terrence Clark and George Smith, another AHS manager. AHS's counsel, Harry Levin, who was conducting an internal investigation of the adoption incident, participated telephonically. In the course of Levin's telephone interview, plaintiff disclosed that Trezza had approved the adoption and that he had indicated her authorization on the "Nine." Plaintiff was then asked to submit a written statement. The following day, the police took over the investigation and obtained from AHS all relevant files, electronic and manual.
Two weeks later, on September 24, 2003, plaintiff was terminated from his employment at AHS. Clark told Smith to let plaintiff go because Trezza wanted him fired. The next day, plaintiff left a voicemail message with the police conducting the investigation into deSwart's death, but apparently never followed through.
Claiming he was fired in retaliation for objecting to the adoption and cooperating with the investigation, plaintiff filed a complaint against AHS, Trezza and Clark[2] alleging violations of CEPA and Pierce[3] public policy. Defendants answered and filed a motion to dismiss, pursuant to Rule 4:6-2(e), for failure to state a claim upon which relief can be granted. The motion judge granted defendants motion as to the Pierce public policy claim, but denied it as to the CEPA claims, which proceeded to trial. At the close of plaintiff's evidence, defendants moved for a directed verdict, pursuant to Rule 4:37-2(b), which the trial judge granted, reasoning:
Now, specifically with regard to Sections [1 and] 3 of the CEPA Act [N.J.S.A. 34:19-3(c)(1) and (c)(3)] that . . . calls for . . . retaliation to an employee who objected or refused to participate in some activity. . . . I do agree with counsel that I would have to say that there is a public policy against the *830 maintenance, if you will, of vicious dogs. . . . [T]here is no evidence that's been presented [that] at the time of the adoption that the plaintiff knew that this was a vicious dog. All that he knew was that the dog had previously bit . . . its owner and had been turned in. And while he had some concerns that a fee was paid for euthanasia and that had not been done he certainly could not reasonably ha[ve] believed that this was a vicious dog. . . . And while his beliefs are a subject[ive] matter whether or not those beliefs were reasonable are subject to a subjective test.
. . . .
Turning now to the first subsection [N.J.S.A. 34:19-3(a)]. . . . And, as initially indicated the plaintiff's initial position was that that was with regard to a claim for consumer fraud. I will, for purposes of this motion, consider whether or not [it could even be] plain fraud. . . . Certainly, as I indicated under the provisions of Pet Dealers could not be a consumer fraud and there is nothing that has been [presented] to the Court with regard to any knowledge that the plaintiff had that would give rise to a belief that there was some type of fraud or other violation of law being committed except his contention that there was a fee paid for euthanasia and that had not been carried out.
. . .
The beliefs of plaintiff are not reasonable and, therefore, could not have formed the basis for any retaliation. And, therefore, the defendant has no obligation to go forward with its proofs. And based on that I'm going to grant the defense motion for a directed verdict as to the complaint
. . . .
In essence, the trial judge found that plaintiff had not sustained his burden of establishing a prima facie case under N.J.S.A. 34:19-3(c)(1), (c)(3), or (a)(1) because he did not have a subjectively reasonable belief that AHS's conduct, to which he objected, was in violation of any public policy, N.J.S.A. 34:19-3(c)(3); nor did he have an objectively reasonable belief that the employer's conduct violated any law, rule or regulation, N.J.S.A. 34:19-3(c)(1) and (a)(1), inasmuch as defendants were exempt from the provisions of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -166. We disagree with the judge's reasoning.
On a motion for a directed verdict, the inquiry is whether the evidence, together with all legitimate inferences that can be drawn from it, may sustain a judgment in favor of the party opposing the motion. R. 4:37-2(b). Otherwise stated, accepting as true all evidence supporting the party opposing the motion and according him or her the benefit of all favorable inferences, if reasonable minds could differ, the motion must be denied. Dolson, supra, 55 N.J. at 5, 258 A.2d 706. The standard is the same for jury and non-jury trials. R. 4:37-2(b). Measured under this standard, we are satisfied that plaintiff's CEPA claims under N.J.S.A. 34:19-3(c) and (a) warranted jury resolution.
CEPA is a civil rights statute. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994), superseded by statute on other grounds, N.J.S.A. 34:19-5. New Jersey's "whistleblow[ing] statute" has been described as one of the most far reaching in the nation. Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179, 707 A.2d 1000 (1998) (citation omitted). "Its purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *831 Abbamont, supra, 138 N.J. at 431, 650 A.2d 958; see also Mehlman, supra, 153 N.J. at 193-94, 707 A.2d 1000 (CEPA's goal "is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare."). In Abbamont, the Court stated:
"We view [CEPA] as a reaffirmation of this State's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge." LePore v. Nat'l Tool & Mfg. Co., 115 N.J. 226, 228, 557 A.2d 1371 (quoting Lepore[ v. National Tool & Mfg. Co.], 224 N.J.Super. 463, 470, 540 A.2d 1296 (1988)), cert. denied, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989). "In New Jersey, we are deeply committed to the principle that an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy." D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 265, 542 A.2d 44 (App.Div.1988) [(citations omitted)], aff'd o.b., 115 N.J. 491, 559 A.2d 420 (1989); see Parker v. M & T Chems., Inc., 236 N.J.Super. 451, 457, 566 A.2d 215 (App.Div.1989); Potter v. Village Bank of N.J., 225 N.J.Super. 547, 543 A.2d 80 (App.Div.), certif. denied, 113 N.J. 352, 550 A.2d 462 (1988).
[Abbamont, supra, 138 N.J. at 431-32, 650 A.2d 958.]
CEPA is considered remedial legislation. Id. at 431, 650 A.2d 958; Estate of Roach v. TRW, Inc., 164 N.J. 598, 610, 754 A.2d 544 (2000). As such, our "`courts should construe CEPA liberally to achieve its remedial purpose.'" Roach, supra, 164 N.J. at 610, 754 A.2d 544 (quoting Barratt v. Cushman & Wakefield, Inc., 144 N.J. 120, 127, 675 A.2d 1094 (1996)). The Legislature intended that the statute "encourage, not thwart, legitimate employee complaints." Ibid.
In order to maintain a cause of action under CEPA, a plaintiff must demonstrate that:
(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in [N.J.S.A. 34:19-3(a) or (c)]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
[Dzwonar v. McDevitt, 177 N.J. 451, 462, 828 A.2d 893 (2003) (citing Kolb v. Burns, 320 N.J.Super. 467, 476, 727 A.2d 525 (App.Div.1999)).]
See also Hernandez v. Montville Twp. Bd. of Educ., 354 N.J.Super. 467, 473, 808 A.2d 128 (App.Div.2002), aff'd o.b., 179 N.J. 81, 843 A.2d 1091 (2004). Generally speaking, CEPA claims "fall into three basic categories: activities that the employee reasonably believes are in violation of some specific statute or regulation [N.J.S.A. 34:19-3(c)(1) and (a)(1)], are fraudulent or criminal [N.J.S.A. 34:19-3(c)(2)], or are incompatible with policies concerning the public health, safety or welfare or the protection of the environment, [N.J.S.A. 34:19-3(c)(3)]." Roach, supra, 164 N.J. at 610, 754 A.2d 544.
Thus, when bringing an action under N.J.S.A. 34:19-3(c), a plaintiff "must *832 identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct." Dzwonar, supra, 177 N.J. at 463, 828 A.2d 893. However, under section (c), a plaintiff "need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy." Dzwonar, supra, 177 N.J. at 462, 828 A.2d 893 (citing Roach, supra, 164 N.J. at 613, 754 A.2d 544; Gerard v. Camden County Health Servs. Ctr., 348 N.J.Super. 516, 522, 792 A.2d 494 (App.Div.), certif. denied, 174 N.J. 40, 803 A.2d 636 (2002)). The plaintiff's only burden is to "show that he or she `reasonably believes' that to be the case." Ibid. (quoting Roach, supra, 164 N.J. at 613, 754 A.2d 544). CEPA
does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true. Instead, a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.
[Id. at 464, 828 A.2d 893 (emphasis added).]
Specifically, a claim under N.J.S.A. 34:19-3(c)(3) requires that a plaintiff "show that the employer's activity, policy, or practice is `incompatible' with a clear mandate of public policy." Maimone v. Atlantic City, 188 N.J. 221, 231, 903 A.2d 1055 (2006). The recognized sources of public policy within the ambit of subsection (c)(3) "include state laws, rules and regulations." Id. at 231, 903 A.2d 1055 (citing Mehlman, supra, 153 N.J. at 188, 193-94, 707 A.2d 1000). Therefore, "a plaintiff who pursues a CEPA claim under . . . subsection [(c)(3)] may rely upon the same laws, rules and regulations that may be the subject of a claim under [subsection] (c)(1)." Ibid. (citing Abbamont, supra, 138 N.J. at 424, 650 A.2d 958). The Maimone Court reasoned
it is easier for an employee who proceeds under [subsection] (c)(3) to prove that he or she reasonably believed the employer's conduct was "incompatible" with a clear mandate of public policy expressed in a law, rule or regulation than to show, as required by [subsection] (c)(1), a reasonable belief that the employer's conduct "violated" a law, rule or regulation.
[Ibid.]
Subsection (c)(3), however, requires an "additional showing that the `clear mandate of public policy' is one that `concern[s] the public, health, safety or welfare or protection of the environment,'" Maimone, supra, 188 N.J. at 231, 903 A.2d 1055 (alteration in original) (quoting Roach, supra, 164 N.J. at 609-11, 754 A.2d 544). This added requirement under subsection (c)(3) is "`unique'" to that subsection. Ibid. (quoting Roach, supra, 164 N.J. at 609, 754 A.2d 544).
On this score, it has been held that "the complained of activity must have public ramifications, and that the dispute between employer and employee must be more than a private disagreement." Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 445, 846 A.2d 604 (2004). For instance, an employer's attempt to impose an unreasonable non-compete clause on an *833 employee does not "implicate the public interest," as it acts solely upon the individual employee, so this cannot be the basis of a N.J.S.A. 34:19-3(c)(3) claim. Id. at 445, 446-47, 846 A.2d 604 (citations omitted). Likewise, an employee who claims employer retaliatory action for complaining about the unfair allocation of overtime does not have a claim under subsection (c)(3) because such a complaint deals with the employee's personal harm, not harm to the public. Cosgrove v. Cranford Bd. of Educ., 356 N.J.Super. 518, 525, 813 A.2d 591 (App.Div.2003).
On the other hand, in Maimone, the Court reversed a grant of summary judgment for the defendants and found that the plaintiff carried his burden of showing an objectively reasonable belief that his employer's actions were incompatible or violative of public policy, as expressed in the State's laws, rules or regulations. 188 N.J. at 231-36, 903 A.2d 1055. There, a police officer was demoted from detective to patrol officer for voicing his concern, in a memorandum, that the police department was no longer enforcing certain laws prohibiting prostitution. Maimone, supra, 188 N.J. at 225-29, 232, 903 A.2d 1055. The Court stated that the laws which prohibit prostitution constitute "a clear mandate of public policy concerning the public, health, safety or welfare[.]" Id. at 232, 903 A.2d 1055 (alteration in original).
In addition to proving a reasonable belief that his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy, a plaintiff must also prove that he performed a "whistle-blowing" activity. For present purposes that consists of disclosing or threatening to disclose to a supervisor or public body the action that violated the law, N.J.S.A. 34:19-3(a)(1), objecting to or refusing to participate in an activity that violates the law, N.J.S.A. 34:19-3(c)(1), or objecting or refusing to participate in an activity deemed incompatible with a clear mandate of public policy, N.J.S.A. 34:19-3(c)(3). Lastly, a CEPA plaintiff must establish that an adverse employment action was taken against him, and that a causal connection exists between the whistle-blowing activity and the adverse employment action. Dzwonar, supra, 177 N.J. at 462, 828 A.2d 893.
Here, viewing the evidence in the light most favorable to plaintiff and giving him the benefit of all reasonable inferences, we are satisfied the proofs set out a claim under subsection (c)(3). With respect to the clear mandate of public policy, our Legislature has recognized the serious and widespread threat that unprovoked dog attacks pose to the safety and welfare of our citizens and accordingly has adopted a comprehensive scheme prescribing various requirements for dogs that are found to be vicious or potentially dangerous, ranging from humane destruction to mandatory licensure of such dogs. N.J.S.A. 4:19-17. Moreover, in adopting our "dog bite" statute, N.J.S.A. 4:19-16, the Legislature imposed absolute liability on owners who knew of the animal's propensity to cause injury, and held those owners not aware of their animal's dangerous tendencies to the ordinary negligence standard. DeRobertis v. Randazzo, 94 N.J. 144, 156, 462 A.2d 1260 (1983). In addition, the State Department of Health has been authorized to promulgate rules and regulations governing the operation and maintenance of kennels and shelters. N.J.S.A. 4:19-15.14. Pursuant thereto, the Department specifically inspects for the improper handling of biting animals and the biting records of animals destroyed.
Collectively, these laws and regulations are closely related to the complained-of conduct at hand, see Dzwonar, supra, and *834 constitute "a clear mandate of public policy concerning the public, health, safety or welfare[,]" necessary to support a claim under N.J.S.A. 34:19-3(c)(3). Maimone, supra, 188 N.J. at 232, 903 A.2d 1055. Indeed, the trial judge acknowledged as much. However, the judge seemed to have based his decision granting defendants a directed verdict on the ground that plaintiff did not subjectively believe the dog was actually vicious. In this, the court erred.
In the first place, as previously noted, the standard is an objective one  did plaintiff entertain an objectively reasonable belief that the adopting out of the Doberman violated or was incompatible with the law or a clear mandate of public policy. Second, the objectively reasonable belief is not necessarily whether the dog was "vicious," but rather whether "`there is a substantial nexus between the complained of conduct'"-adopting out a dog that had a history of biting humans-and "`[the] law or public policy identified . . . by plaintiff'"-here the statutes and regulations in place to protect people from dangerous dogs. Maimone, supra, 188 N.J. at 233, 903 A.2d 1055 (alterations in original) (quoting Dzwonar, supra, 177 N.J. at 464, 828 A.2d 893). We are satisfied there is proof that plaintiff had an objectively reasonable belief that AHS's decision to allow deSwart to adopt a dog that had bitten its previous owner and was supposed to be euthanized was inherently "incompatible" with New Jersey's public policy of protecting its citizens from these animals. Id. at 231, 828 A.2d 893.
We are also satisfied there is proof from which a reasonable factfinder could conclude plaintiff engaged in protected "whistle-blowing" activity and was punished for it. According to plaintiff, out of concern for deSwart's safety, he voiced his objections to the adoption first to his immediate supervisor and then, through Lovey, to the executive director, who was made aware of plaintiff's concerns. Moreover, following adoption, plaintiff effectively reiterated his reservations to outside counsel conducting the internal investigation of the incident and identified Trezza as authorizing the adoption. Approximately three weeks after the dog killed deSwart, plaintiff was discharged, which comes within the definition of "retaliatory action." N.J.S.A. 34:19-2(e); see also Maimone, supra, 188 N.J. at 235-36, 903 A.2d 1055. And, lastly, the temporal proximity of plaintiff's objections and his discharge allow an inference of a causal connection. Maimone, supra, 188 N.J. at 237, 903 A.2d 1055.
We further conclude that the trial judge erred in finding that since AHS, because of its status as a non-profit entity, is not subject to the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -166, Pet Dealers Ass'n v. Div. of Consumer Affairs, 149 N.J.Super. 235, 239, 373 A.2d 688 (App. Div.), certif. denied, 75 N.J. 16, 379 A.2d 247 (1977), plaintiff has not identified a specific law or regulation of which defendants are in violation, to sustain a claim under N.J.S.A. 34:19-3(c)(1) or N.J.S.A. 34:19-3(a)(1). As noted, a plaintiff "need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy." Dzwonar, supra, 177 N.J. at 462, 828 A.2d 893 (citing Roach, supra, 164 N.J. at 613, 754 A.2d 544; Gerard, supra, 348 N.J.Super. at 522, 792 A.2d 494). Rather, a plaintiff's burden is to "show that he or she `reasonably believes' that to be the case." Ibid. (quoting Roach, supra, 164 N.J. at 613, 754 A.2d 544).
In Gerard, the Court reversed the grant of summary judgment to defendants under N.J.S.A. 34:19-3(c)(1) and (2). 348 N.J.Super. at 524-25, 792 A.2d 494. *835 There, the plaintiff, an assistant director, refused to discipline an employee when her investigation revealed that the employee did nothing wrong, id. at 518-19, 792 A.2d 494, believing that discipline would be both violative of the employee's civil rights and fraudulent. Id. at 523-24, 792 A.2d 494. The plaintiff, however, could not articulate a particular statute that would be violated. The Court, in allowing the plaintiff's CEPA claim to proceed, did "not impose precise legal knowledge upon her[,]" and concluded that she "could have objectively reasonably believed the filing of charges that she believed were substantially unfounded against [the employee] was violative of proper quality of patient care [under] N.J.S.A. 34:19-3(c)(1). . . ." Id. at 524, 792 A.2d 494.
As in Gerard, plaintiff here is not charged with precise legal knowledge, and his belief that AHS was violating the Consumer Fraud Act when it adopted out a dog it had been paid to euthanize should be read "indulgently." Ibid. Plaintiff knew from the "Nine" that AHS had previously been paid to euthanize the dog, and that AHS was accepting money from deSwart for the adoption, in contravention of AHS's agreement with the dog's former owner. Under the circumstances, there appears an arguably reasonable basis for believing that defendants engaged in activity violative "of a law, or a rule or regulation . . . involving deception of, or misrepresentation to, any . . . customer . . . of the employer. . . ." N.J.S.A. 34:19-3(a)(1) and (c)(1).
There also appears a reasonable basis for finding plaintiff engaged in protected "whistle-blowing" activity under N.J.S.A. 34:19-3(a), namely disclosure to a supervisor or a public body. According to plaintiff, he complained of the violative activity to his immediate supervisor, Lovey, and then made disclosure to AHS's counsel, Levin, during an internal investigation at which another supervisor, Clark, and the executive director, Trezza, were present. This level of disclosure suffices for purposes of N.J.S.A. 34:19-3(a). See Roach, supra, 164 N.J. at 614-15, 754 A.2d 544 (court sustained a jury's finding of liability under N.J.S.A. 34:19-3(a) where the plaintiff revealed co-employees' improper conduct to a supervisor and the supervisor only discussed the issue with one of the co-employees before dismissing the complaint); Hernandez, supra, 354 N.J.Super. at 470-72, 477, 808 A.2d 128 (court sustained a jury's verdict of liability under N.J.S.A. 34:19-3(a), where the plaintiff, a school custodian, reported unsanitary conditions in the bathrooms and unlit exit signs to four separate supervisors).
Defendants nevertheless contend there was no "disclosure" because the information was already recorded on the "Nine." We disagree. Accepting plaintiff's proofs as true, he disclosed that Trezza adopted the dog out even after she knew the dog's biting history, a fact not revealed on the "Nine." We recognize that Trezza denies such knowledge, but the credibility dispute on this point should be resolved by a jury.
In sum, viewing the evidence in the light most favorable to the plaintiff, and drawing all inferences in his favor, we find that his proofs set out a CEPA claim under subsections (c)(3), and (c)(1) and (a)(1).
Reversed and remanded.
NOTES
[1] This facility no longer exists.
[2] The complaint against Clark was eventually dismissed pursuant to a stipulation of dismissal with prejudice.
[3] Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980).