**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0131-20

KRISTIAN KIRCHNER,

     Plaintiff-Respondent,

v.

CITY OF VINELAND,

     Defendant-Appellant,

and

MATTHEW BROWNE, PEDRO
CASIANO, BRAD MARCHESANO,
ANTHONY RUBERTI, CHARLES
CAPELLI, GARY APEL, CRAIG
SCARPA, GREGORY PACITTO,
TIMOTHY CODISPOTI,
LEONARD WOLF and JOHN
LAURIA,

     Defendants.

_____

        Argued February 3, 2021 – Decided December 30, 2021

        Before Judges Ostrer, Accurso and Vernoia.

On appeal from an interlocutory order from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-0318-17.

Patrick J. Madden argued the cause for appellant (Madden & Madden, PA, attorneys; Patrick J. Madden and Mark W. Strasle, on the briefs).

Jennifer M. Carlson argued the cause for respondent (Richard M. Pescatore, PC, attorneys; Richard M. Pescatore, on the brief).

PER CURIAM

Defendant City of Vineland is here on our leave to appeal the denial of its motion for summary judgment dismissing former Vineland police detective, plaintiff Kristian Kirchner's claim under N.J.S.A. 34:19-3(c)(3) of the Conscientious Employees' Protection Act, N.J.S.A. 34:19-1 to -14. Kirchner claims he was demoted and harassed after he "blew the whistle" on Cumberland County's First Assistant Prosecutor's alleged delay in conducting the criminal investigation of a confidential informant and refused the First Assistant's direction to remove any reference to the informant or the investigation in a police report.

We conclude the trial court erred by failing to sufficiently identify a standard by which the prosecutor's conduct could be measured and determined to be incompatible with a clear mandate of public policy, as required by

Hitesman v. Bridgeway, Inc., 218 N.J. 8, 32-33 (2014). The public policies of "enforcing the law for the protection of the public" and "upholding the rights of an accused to confront witnesses against them," proffered by plaintiff and relied on by the court, are too amorphous and provide no standard against which the specific conduct he complains of here could be measured and found to be illegal or unethical as opposed to ordinary discretionary acts by the prosecutor and Vineland. Because our Supreme Court has admonished that "[t]he trial court can and should enter judgment for a defendant" when the plaintiff has failed to "identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct," Dzwonar v. McDevitt, 177 N.J. 451, 463 (2003), we reverse the order and direct summary judgment for Vineland on plaintiff's CEPA claim.

The parties agree on these facts. Plaintiff was hired by the Vineland Police Department in 1998 as a police dispatcher. He became a full-time police officer in May of 2001. At that time, the Department consisted of three divisions: the Patrol Division, the Criminal Division, and the Records Division. Plaintiff began his full-time employment in the Patrol Division, as did all full-time officers. He was assigned to the Detective Bureau, which was part of the Criminal Division, seven years later in 2008. His duties as a detective included

investigating major crimes, attending autopsies, collecting evidence, interviewing and locating witnesses, testifying in court, and obtaining search warrants.

In August or September 2011, plaintiff and defendant Pacitto, another detective in the Department, were assigned to work solely on an investigation related to gang activity in Vineland. The gang investigation was begun in the Department and then brought to the Cumberland County Prosecutor's Office, which led the investigation going forward. The target of the gang investigation was Edwin "Pistol Pete" Sanchez. Sanchez had served as a confidential informant for the Department for almost ten years.[1]

In connection with the gang investigation, plaintiff and Pacitto sought a communications data warrant for a telephone number associated with Sanchez, sending a draft of the proposed affidavit and order to First Assistant Prosecutor Harold Shapiro for approval.[2] Although it is not clear from the record exactly when Shapiro received the initial draft, it appears to have been in August or September 2011.

---

[1] As the parties have not attempted to conceal Sanchez's identity here, neither do we, and assume his identity has already been publicly disclosed.

[2] Before seeking judicial approval for a warrant in New Jersey, police officers are required to obtain permission from a prosecutor.

Although both sides agree there was probable cause to support the warrant application, Shapiro required several rounds of edits to the documents, which plaintiff believed were largely "grammatical" and Pacitto thought were "excessive and they were, basically, beyond the point of any reasoning, for some of them."[3]

Plaintiff believed "[f]or reasons unknown to [him], and upon which he can only speculate, it became clear . . . that Shapiro was purposely stalling the investigation into" Sanchez. Plaintiff took exception to the delay because he thought Shapiro was not "fulfilling his duty to act" as a prosecutor should.

Pacitto testified his "opinion" and "guess at the time" was that Shapiro delayed the warrant because he "didn't want any type of wrinkles" with certain home invasion cases he was prosecuting for which Sanchez had been a confidential informant. When asked if he believed Shapiro perceived the

_____

[3] Both sides note that another Vineland detective, "Gamy" Cruz, had been fired several months before, after an investigation by the prosecutor's office, for lying to a judge about not knowing the identity of a confidential informant in an application for a search warrant. As a result, the First Assistant advised the Department it had dismissed eleven cases involving twenty defendants, thirteen of whom had been charged with first- or second-degree crimes. The fallout from those events had apparently strained relations between the Department and the Prosecutor's Office. Although those facts may have certainly affected perceptions on both sides, they are irrelevant for the issue we review on summary judgment.

communications data warrant to be "interfering with something he was doing separately," Pacitto responded:

> Yes, because the C[onfidential] I[nformant] [Sanchez], I believe, gave information on the people that [Shapiro] was prosecuting. So that was part of the problem, that if the CI is playing both ends and you're using, possibly, his information to get to a target, so I imagine that would mess up an investigation.

Throughout the gang investigation, plaintiff complained to his supervisors at the Department, including "Lieutenant Pagnini, Lieutenant Finley, Lieutenant Wolfe, and Captain Beu," about what plaintiff perceived to be Shapiro's "undue and unreasonable delays in the investigatory process." Plaintiff requested the matter be forwarded to the Attorney General for investigation. Pacitto also believed the Attorney General should look into Shapiro's conduct. Pagnini responded by saying plaintiff had "over-reacted" and "was crazy" and predicted forwarding the matter would be futile.

In early October 2011, William Johnson, Chief of Investigators of the Prosecutor's Office, contacted plaintiff to ask about the delay in the gang investigation. Plaintiff met with Johnson on October 6, 2011, and told him Shapiro had failed to act on the proposed communications data warrant despite all the revisions he wanted having been made. Plaintiff gave a copy of the package to Johnson and, within a few hours, Shapiro signed it. A judge

6

authorized the warrant the following day. On October 11, 2011, at Shapiro's direction, Sanchez was informed his status as a confidential informant was terminated.

Plaintiff and Shapiro continued to have issues and disagreements as the gang investigation progressed. At a December 6, 2011 meeting in connection with revising a wiretap affidavit, Shapiro demanded the alteration of a particular passage that plaintiff insisted included "wording [that had] been previously used" and that the "exact context was taken out of [an] FBI Electronic Surveillance Manual." Shapiro "advise[d] [that] he did not care and wanted the wording changed." Shapiro called plaintiff "unprofessional." Plaintiff told Shapiro he thought him "the worst first assistant [he] had ever seen," and he walked out of the meeting before it was over.

Plaintiff believed the Department was "distressed with the length of time" devoted to the gang investigation and that it "put the blame" on him and Pacitto even though "it was not our fault." He testified he "felt that, as the investigation progressed, they kind of left me out there to hang."

On January 5, 2012, at the direction of the Prosecutor's Office, Sanchez was arrested in connection with two home invasion robberies that had taken place two years before. Sanchez's daughter, Nicole Castro, was present at the

7

time of the arrest and was interviewed by plaintiff at the Millville Police Department.

Shapiro requested that plaintiff prepare supplementary reports regarding the 2010 robberies for which Sanchez had been arrested and plaintiff's interview of Castro, which he did on January 20, 2012. Plaintiff included in those reports references to the "Confidential Investigation related to the organized criminal activity" of Sanchez, the fact that the investigation had begun in August 2011, and details regarding Sanchez's prior status as a confidential informant. Shapiro and the Cumberland County Prosecutor had concerns about including that specific information in the supplementary reports, and on a Saturday plaintiff "was advised that the prosecutor had an issue with" plaintiff's reports and "wanted to meet to discuss it" on the following Monday. Plaintiff understood the Prosecutor was effectively "calling [him] on the carpet."

Plaintiff "called out"[4] of work on the day of the meeting and did not attend, although members of the Prosecutor's Office and plaintiff's superiors at the Department, Beu and Finley, held the meeting in his absence. Plaintiff was "written up" for missing the meeting.

---

[4] At his deposition, plaintiff testified "a personal issue came up" the night before the meeting, and he "realized [he] wasn't going to be able to make it to work" the following day because he was not feeling well.

A-0131-20

On January 31, 2012, plaintiff met with Beu and Pagnini about the "write up," but they also discussed the issues raised by the Prosecutor's Office about plaintiff's supplementary reports. Plaintiff was advised the Prosecutor's Office "wanted [him] to remove any mention of the informant, his name, and any reference to the confidential investigation itself." Beu and Pagnini "encouraged" plaintiff to remove the designated references from his supplementary reports, stating "it was at the request of the prosecutor and to just do it to appease them."

Plaintiff objected to altering the reports. At his deposition, he explained he had "two reasons" for his objection:

> One, you can't identify — you can't go through A, B, C without being there, but there was no way for me to explain it, and if this came to some kind of trial or testimony of mine, I wasn't going to perjure myself because they wanted me to leave something out for their interests, and, the other reason being, legally, in discovery, the defendants are entitled to this information, so I'm not going to leave things out, because that opens me up, again, to a perjury-type situation, if I have to get up on the stand and testify, and there would be no way for me to explain the background, how we got to point C, if we left A or B out, and that is how they wanted me to rearrange this report, and it was impossible for me.

A-0131-20

Plaintiff did not revise his January 2012 supplementary reports and, as far as he was aware, the final versions included the references to Sanchez and the confidential investigation.

In plaintiff's "Confidential Investigation" report, updated on February 17, 2012, he criticized Shapiro, stating:

> The First Assistant has demonstrated that the investigative methods utilized to obtain sufficient evidence to further the investigations beyond the scope of the prosecution are not possible to be carried out by him due to lack of experience from an investigative or law enforcement initiative. This has been clearly demonstrated by his decisions and direction through the investigation. His direction has been solely based in his legal experience and he has refused to take into consideration the advice and experience of the investigators both from his office and this Agency. This would also include the investigative advice and opinion of command staff investigators supervising the operation. Thus far evidence has been successfully obtained against both Sanchez and [another defendant] despite these factors. Again due to the conflicts at the Prosecutors Office they have proven extremely difficult to work with, and the assistance provided to us with completing the legal process required for the application of several warrants has been a laborious and frustrating process.

Plaintiff asked to be removed from the gang investigation "numerous times" because of his issues with Shapiro. On March 27, 2012, he sent a weekly progress report on the investigation to Beu, Finley, Pagnini, Pacitto, and

A-0131-20

defendant Sergeant Leonard Wolf, together with an email noting he "would like to formally request to be taken off of the investigation." Plaintiff explained "with only two men assigned to this investigation who are properly trained in communications data analysis[,] it is impossible to thoroughly complete the objectives of the investigation." He added:

> Due to the fact that this investigation is highly based in communications technology analysis, the time frame is not reasonable for the amount of manpower and the continued stress of meeting these unrealistic deadlines is not something I would like to be a part of any longer. I cannot properly complete the investigation within the time frame given. Although the investigation has taken 8 months, the fact that the First Assistant delayed and wasted approximately the first 4 to 5 months has never been truly taken into account on our part. The investigators have been held responsible and due to this factor, unreasonable time constraints have been placed on us due to manpower shortages.

Beu informed plaintiff he could not be removed from the investigation because he was the only officer in the Department "with the specialized training," and it would be unfair to Pacitto, who was in the process of being trained.[5]

In August 2012, plaintiff and Pacitto were directed to cease working on the gang investigation and to return to their regularly assigned duties with the

---

[5] It is not clear from the record if Beu's remarks came in response to the March 27, 2012, email or one or more of plaintiff's other "numerous requests" to be removed from the gang investigation.

11

Department, effective September 3, 2012. Pagnini acknowledged the two had "put an enormous amount of work into this case," but advised the command structure felt "adequate time has been spent on this investigation and numerous time extensions have been granted already. It is our opinion that no further extension can be provided." Plaintiff and Pacitto were also advised they would still be required "to assist the Prosecutor's Office with finalizing charges and targets, as well as follow up investigation."

Fifteen months later, on December 2, 2013, plaintiff was notified he was being transferred to the Patrol Division, which he perceived as a demotion. The commanding officer of the unit, Lt. Pagnini, was also transferred to patrol at the same time. On December 24, 2013, plaintiff "began an extended absence from employment due to mental health issues."[6] Plaintiff was "sent for a fitness for duty evaluation" in April 2015, and the evaluator issued a report in May 2015, finding plaintiff was unable to perform the duties of his position.[7]

---

[6] Plaintiff filed his initial complaint against Vineland in June 2014, while on extended leave.

[7] On May 1, 2015, Wolf received a telephone call from plaintiff's ex-girlfriend's father expressing concern for plaintiff. Plaintiff had left messages on his ex-girlfriend's voicemail suggesting he might be suicidal. Browne, Pacitto, and other Department officers responded to plaintiff's home. Plaintiff was taken involuntarily to a crisis center, in handcuffs, where he was released after doctors

Plaintiff was notified in July 2015 that he was being terminated, and, following a departmental hearing in December 2015, the hearing officer determined plaintiff was not fit for duty. The termination decision "was ultimately modified to reflect a resignation in good standing." In January 2016, plaintiff's application for ordinary disability retirement was approved, with an effective retirement date of August 1, 2015.

Sanchez, following his arrest in January 2012, pleaded guilty to charges in four indictments and received a seventeen-year prison term, eighty-five percent of which must be served before he can be considered for parole. He is currently incarcerated and not eligible for parole until June 2026.

After hearing argument on Vineland's motion, the trial judge recapitulated plaintiff's CEPA claims that Shapiro "stalled the investigation against Sanchez" by the "over-editing of warrant affidavits" and "delay in responding to

---

determined he was not a danger to himself or others. After plaintiff was removed from his home, Browne ordered a search of the premises without a warrant, pursuant to the community caretaking doctrine. Browne, Casiano, Marchesano, Apel, and Scarpa took possession of the weapons and ammunition they located in plaintiff's home. Plaintiff subsequently amended his complaint to include a claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, for the violation of his constitutional rights. The trial court found disputed facts surrounding plaintiff's forcible transportation to the crisis center, but that plaintiff was entitled to summary judgment as to the search and seizure of his property. That issue is not before us on this interlocutory appeal.

applications for warrants" during the time "plaintiff complained that Sanchez was out there about to commit other crimes against the community that could have been prevented had the investigation of Sanchez not been delayed." Plaintiff's "thought was that there was an intentional delay and other crimes were being committed that should have been and could have been stopped." Plaintiff claimed "[t]he delay was so concerning that he wanted the Vineland Police Department to report it to the Attorney General's Office."

The court acknowledged Vineland's arguments "that the Prosecutor has significant discretion in what crimes to prosecute and why," but found "that's not the question here. The question is . . . whether [plaintiff's] belief was objectively reasonable." Considering the facts in the light most favorable to plaintiff "and the information that he had and that was available to him," the court found "the fact that the Prosecutor had discretion wouldn't preclude a finding that [plaintiff] had an objectively reasonable belief that what occurred was a violation of public policy."

The judge noted "[g]ood arguments are made by the defense" and expressed the view it was not "a particularly strong plaintiff's case," but concluded it wasn't her "place to make that judgment." Considering the facts in the light most favorable to plaintiff, the judge concluded she couldn't

14

say that a reasonable jury could not find that plaintiff had a reasonable belief that the Vineland Police Department was engaging in activity that was contrary to the public policy of enforcing the law for the protection of the public and upholding the rights of an accused to confront witnesses against them. Specifically, the allegation is that the Prosecutor was not prosecuting Sanchez because that would then affect the credibility of the State's witness against another defendant. And so that would affect the defendant — the defendant's right to confront the witnesses against him, specifically Sanchez, against him and the other prosecutions that were ongoing.

As to plaintiff's "other allegation of whistleblowing," that "plaintiff was instructed to remove potentially exculpatory information pertaining to the use of confidential informants from investigation reports and that he objected to doing that," the judge found "a sufficient basis for a jury to find that this objection to being told to remove exculpatory or potentially exculpatory information from a police report, a jury could find that [plaintiff] had a reasonable belief that that was either contrary to law or public policy."

Vineland appeals, contending plaintiff's CEPA claim should have been dismissed on summary judgment because he failed to identify any "law, rule, regulation, statute or clear mandate of public policy that . . . would have been violated by the Prosecutor's actions." We agree.

15

We review summary judgment using the same standard that governs the trial court. Allen v. Cape May Cty., 246 N.J. 275, 288 (2021). As the parties agreed on the material facts for purposes of the motion, our task is limited to determining whether the trial court's ruling on the law was correct. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

CEPA was enacted in 1986, following our Supreme Court's "opinion in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980), to cement this State's commitment to 'protect and encourage employees to report illegal or unethical workplace activities.'" Chiofalo v. State, 238 N.J. 527, 539 (2019) (quoting Dzwonar, 177 N.J. at 461). The statute's "critical substantive provisions are contained in N.J.S.A. 34:19-3," id. at 540, which, as pertinent to this appeal, provides as follows:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
>      . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer,

employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

Plaintiff's CEPA claim falls under N.J.S.A. 34:19-3(c)(3) in that he contends he objected to or refused to participate in activities or practices by the Department and the Prosecutor's Office he reasonably believed were "incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."

Our Supreme Court has "identified, and reduced to a simple list, the necessary elements for a plaintiff to establish a prima facie claim under CEPA." Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015). Specifically:

To establish a prima facie CEPA action, a plaintiff must demonstrate that:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or

17

regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Ibid.]

Because it is remedial legislation, CEPA is to "be construed liberally to effectuate its important social goal," namely, "to encourage, not thwart, legitimate employee complaints." Dzwonar, 177 N.J. at 463; see also, e.g., Donelson v. DuPont Chambers Works, 206 N.J. 243, 257 (2011) (noting CEPA's liberal construction in light of its "broad remedial purpose"); Turner v. Associated Humane Societies, Inc., 396 N.J. Super. 582, 591 (App. Div. 2007) ("CEPA is a civil rights statute" that "has been described as one of the most far reaching in the nation.").

The Court long ago held "[t]he goal of CEPA . . . is 'not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or

18

welfare.'" Dzwonar, 177 N.J. at 464 (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94 (1998)). Accordingly, N.J.S.A. 34:19-3(c) "does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true"; rather, a plaintiff need only establish "facts that would support an objectively reasonable belief that a violation has occurred." Id. at 464.

Nevertheless, the Court has also long held in those cases in which a plaintiff claims the employer's conduct was incompatible with public policy concerning the public's health, safety or welfare or the protection of the environment "that the mandate of public policy be clearly identified and firmly grounded. A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate. Its alleged violation will not sustain a wrongful discharge cause of action." Mehlman, 153 N.J. at 181 (quoting MacDougall v. Weichert, 144 N.J. 380, 391-92 (1996)). As the Court has taken pains to explain, "because the sources and parameters of public policy are not susceptible to hard and fast rules, 'the judiciary must define the cause of action in case-by-case determinations.' That recognition applies not only to the common-law retaliatory discharge claim but to the more expansive CEPA claim as well." Id. at 187 (quoting Pierce, 84 N.J. at 72).

19

Accordingly, there is no question but that as to the first prong of a plaintiff's prima facie case, "the determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law.  It's resolution often will implicate a value judgment that must be made by the court, and not by the jury."  Ibid.

The Court made that point emphatic in Dzwonar, explaining "when a plaintiff brings an action pursuant to N.J.S.A. 34:19-3(c), the trial court must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct.  The trial court can and should enter judgment for a defendant when no such law or policy is forthcoming."  177 N.J. at 463.  It has since elaborated "[t]hat identification is important for other parts of the analysis."  238 N.J. at 541.  Specifically, "[s]atisfaction of the identification requirement enables the trial court to 'make a threshold determination that there is a substantial nexus between the complained-of conduct and [the] law or public policy identified by the court or the plaintiff.'"  Id. at 542 (quoting Dzwonar, 177 N.J. at 464).  The Hitesman Court described identification of "the authority that provides a standard against which the conduct of the defendant may be measured" as "a pivotal component of a CEPA claim."  218 N.J. at 32-33.

A-0131-20

Hitesman illustrates the specificity required of the trial court in identifying the public policy mandate against which the defendant's conduct is to be measured in a CEPA section 3(c)(3) case. Hitesman was a registered nurse who was fired after he complained to his employer, a nursing home, about the rate of infectious diseases among patients, "reported his concerns to governmental agencies and the press, and disclosed partially-redacted records of patient care to a television reporter." Id. at 14. He brought a CEPA claim under N.J.S.A. 34:19-3(c)(3), contending the nursing home's actions were "incompatible with a clear mandate of public policy concerning the public health."[8] Id. at 15. To establish the claimed mandate of public policy, Hitesman relied on "the American Nursing Association (ANA) Code of Ethics and two [of the defendant's] documents — a portion of its Employee Handbook and its Statement of Resident Rights." Ibid.

Following a jury verdict on liability in the plaintiff's favor, we reversed, holding Hitesman's CEPA claim failed as a matter of law because he did not demonstrate an objectively reasonable belief that his employer's conduct was

---

[8] The plaintiff also alleged his employer engaged in an "activity, policy, or practice" that he reasonably believed constituted "improper quality of patient care," under N.J.S.A. 34:19-3(a)(1) and N.J.S.A. 34:19-3(c)(1), but the Court's analysis of those subsections is largely inapplicable here.

incompatible with a clear mandate of public policy. Ibid. The Supreme Court agreed, holding "a plaintiff asserting that his or her employer's conduct is incompatible with a 'clear mandate of public policy concerning the public health' must, at a minimum, identify authority that applies to the 'activity, policy or practice' of the employer." Ibid.

The Court reiterated the trial court must determine "whether there is a substantial nexus between the complained-of conduct and a 'clear mandate of public policy' identified by the court or the plaintiff" before the fact issue of the plaintiff's objectively reasonable belief could be submitted to the jury. Id. at 31. When a CEPA plaintiff "alleges employer conduct 'incompatible with a clear mandate of public policy concerning the public health' under N.J.S.A. 34:19-3(c)(3), the plaintiff must identify the authority that provides a standard against which the conduct of the defendant may be measured." Id. at 32-33.

The Court held the "'clear mandate' of public policy need not be enacted in a constitution, statute or rule, but must nonetheless provide a definite standard by which the employer's conduct may be gauged." Id. at 33. "'"[A] clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that, under [N.J.S.A. 34:19-3(c)(3)], there should be a high degree of public certitude in

22

respect of acceptable vers[u]s unacceptable conduct.'" Id. at 34 (quoting Maw v. Advanced Clinical Communs., Inc., 179 N.J. 439, 444 (2004)). "[O]ur courts have recognized various sources of authority bearing the required substantial nexus to the plaintiff's claim," but "[i]n each case, the law, regulation, or other authority held to support a CEPA claim, not only expressed a 'clear mandate of public policy,' but identified acceptable and unacceptable practices in the defendant employer's business." Id. at 34. In the absence of "authority meeting the statutory criteria that serves as a standard for the employer's conduct," a plaintiff's "CEPA claim fails." Id. at 35.

The Hitesman Court examined the "authorities" Hitesman relied on and held that none established a standard of conduct against which the employer's conduct could be measured and found to be incompatible with a clear mandate of public policy. Although the Court noted the nursing code of ethics "encourage[d] reporting of deficient practice to appropriate authorities," it "d[id] not govern [the defendant's] patient care" because it contained "no general standard for infection control in a nursing home, much less specific direction on how [the defendant] should have treated its patients' illnesses" at the relevant time. Id. at 37. The nursing code did not "prescribe for [the defendant] a 'readily discernible course of action that is recognized to be in the public interest,' from

23

which [the Court could] discern a 'clear mandate of public policy.'" Id. at 37 (quoting Maw, 179 N.J. at 444).

The Employee Handbook cited by Hitesman also fell "short of the mark." Ibid. Although the handbook "establishe[d] basic legal and fundamental principles" for the operation of the nursing home, set forth "ethical standards for [the defendant's] staff," and mandated "employee compliance with laws and regulations," it did not "provide a governing standard for [the defendant's] response to infectious diseases in patients, or otherwise define an adequate response to any condition or disease." Id. at 37-38. The Statement of Resident Rights cited by Hitesman similarly "ha[d] no relationship to the subject of his complaints — allegedly deficient control of infection in staff and residents," and it "articulate[d] no 'clear mandate of public policy' as required by N.J.S.A. 34:19-3(c)(3)." Id. at 38-39.

Hitesman teaches that a generalized public policy, such as that a nursing home should prevent a high rate of infectious diseases among residents and staff, does not constitute a "clear mandate of public policy" sufficient to support a CEPA claim because it does not provide a standard against which the conduct of any particular nursing home could be measured.

24

Our opinion in <u>Schechter v. New Jersey Department of Law & Public Safety, Division of Gaming Enforcement</u>, 327 N.J. Super. 428 (App. Div. 2000),[9] is also instructive. There, the plaintiff was employed by the Division of Gaming Enforcement in a unit that "investigate[d] persons who may be subject to exclusion from casinos because of criminal activity or because their presence in a casino would be inimical to the public interest." <u>Id.</u> at 430. The plaintiff's CEPA claim was based on the Division's alleged "failure to act on some of his recommendations for placement of persons on the casino exclusion list and the transfer of agents out of his unit." <u>Id.</u> at 430-31.

We agreed with the trial court the plaintiff's claim failed as a matter of law, in part because the plaintiff "had failed to identify any statute, regulation or other clear mandate of public policy" governing the Division's actions. <u>Id.</u> at 431. We found that although the plaintiff claimed "the failure of the [Division]

---

[9] We note the principles in <u>Schechter</u> on which we rely were not "abrogated" by <u>Dzwonar</u>. The <u>Dzwonar</u> Court only disapproved that portion of <u>Schechter</u> (and other cases) that imposed an "additional procedural hurdle" requiring the plaintiff in a case brought under N.J.S.A. 34:19-3(c) to "allege facts that, if true, actually would violate that statute, rule, or public policy." The <u>Dzwonar</u> Court concluded that section "does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts . . . allege[d] are true. Instead, a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred." 177 N.J. at 464. <u>Schechter</u> otherwise continues to be good law. <u>See</u> <u>Hitesman</u>, 218 N.J. at 32; <u>Maimone</u>, 188 N.J. 234.

to pursue exclusion cases and other investigations was a violation of law or rule or regulation promulgated pursuant to law," the case actually "involve[d] nothing more than a policy dispute between the Division's middle and upper level management concerning the priority to be assigned to exclusion cases." Id. at 432.

We likewise rejected the plaintiff's argument that "even if the Division's refusal to approve his recommendations concerning exclusion cases did not violate a specific statute, rule or regulation, its policy determination to assign lower priority to such cases was contrary to former Governor Byrne's assurance that '[w]e will keep organized crime out of Atlantic City.'" Id. at 435. Writing for the court, Judge Skillman explained that "general pronouncements of public policy" were not akin to the "specific provisions of the statute and implementing regulations that prescribe [the Division's] regulatory powers and responsibilities." Ibid.

We also noted "the Division could reasonably have concluded that the maintenance of the exclusion list plays a less important role in preserving the integrity of the gaming industry than many of its other regulatory responsibilities, such as investigations relating to the licensing and regulation of casino operators and employees." Ibid. We concluded "the Division's decision

26

to assign a lower degree of priority to exclusion cases than in prior years did not violate any . . . 'clear mandate of public policy,' as required to maintain a cause of action under CEPA."  Id. at 434.

Applying those standards here makes plain the generalized public policies identified by the trial court of "enforcing the law for the protection of the public" and "upholding the rights of an accused to confront witnesses against them," were insufficiently specific to constitute a standard by which the Department's or Prosecutor's Office's conduct can be measured in this case.

As to the public policy of enforcing the law, plaintiff alleges Shapiro delayed the gang investigation for several months, but neither he nor the court referenced any standard governing the timing of such investigations.  Viewed in the light most favorable to plaintiff, the investigation targeting Sanchez was begun in August 2011.  Plaintiff presented a draft of the application for the communications data warrant to Shapiro in August or September.  Shapiro signed the application on October 6, and the court signed the warrant on October 7.  The Department advised Sanchez his services as a confidential informant were terminated on October 11, and he was arrested on January 5, 2012.  Even crediting that a factfinder could find plaintiff reasonably believed Shapiro intentionally delayed the gang investigation for four or five months, plaintiff has

27

pointed to no standard establishing such a delay was improper or incompatible with Shapiro's duty to enforce the law, which of course, also included balancing priorities and prosecuting defendants other than Sanchez.[10]

Similarly, plaintiff's belief the gang with which Sanchez was involved committed crimes that might not otherwise have been committed if the gang investigation had proceeded more expeditiously fails to connect to a measurable standard of behavior a factfinder could apply to the prosecutor's conduct. Plaintiff does not claim the Prosecutor's Office was aware that a particular crime would occur on a particular date before Sanchez's arrest in January 2012 and intentionally delayed his arrest despite that knowledge. Rather, plaintiff's allegation is essentially that ongoing crimes occurred that might not have had Shapiro followed plaintiff's preferred timetable for the investigation and arrest.

Whenever the State conducts any large-scale investigation of an ongoing criminal enterprise, however, it develops leads and evidence over months, or even years, and it may well be true that a speedier investigation or an earlier arrest could prevent some crimes. That reality doesn't translate into an affirmative obligation on the part of the prosecutor to investigate, make arrests,

---

[10] We note that we do not consider what we presume would be Shapiro's vigorous defense to plaintiff's various contentions and perceptions as it is irrelevant to the issues on appeal.

and charge crimes as soon as humanly possible. Many factors enter into the calculus of when to strike and how to strike in such an investigation, including the best means to develop evidence against multiple subjects and the needs of other investigations and prosecutions going forward.

Here, plaintiff's claim is essentially that the public would have been safer and fewer crimes would have been committed had Shapiro done his job the way plaintiff thought he should. Showing Shapiro could have done a better job — presuming plaintiff could — does not, however, make out a CEPA claim. Rather, plaintiff must be able to show that Shapiro was obligated to do his job in a specific and measurable way, and that plaintiff had an objectively reasonable belief that specific conduct fell short of that standard.

In finding "upholding the rights of an accused to confront witnesses against them" was a mandate of public policy on which plaintiff's CEPA claim could rest, the trial court likewise failed to identify how so imprecise a standard defined acceptable and unacceptable practices guiding the prosecutor in the context of this case. See Hitesman, 218 N.J. at 34. Plaintiff, in his brief on appeal, cites to Rule 3:13-3 as a source for a prosecutor's obligation to produce

exculpatory information to a defendant.[11] Rule 3:13-3 provides a comprehensive standard for measuring a prosecutor's discovery obligations to a defendant both pre- and post-indictment. Thus, it likely could express "a clear mandate of public policy," as the Rule is akin to the sources courts rely on to inform a determination as to "whether specific corrupt, illegal, fraudulent or harmful activity violates a clear mandate of public policy," Mehlman, 153 N.J. at 188, and it identifies acceptable and unacceptable practices that guide the prosecutor in meeting his discovery obligations to those charged with crimes, see State v. Hernandez, 225 N.J. 451, 462 (2016) (explaining "[t]he metes and bounds of the State's discovery obligation to the defense is found in Rule 3:13-3(b), which states that '[d]iscovery shall include exculpatory information or material' and 'relevant material,' including all items set forth in ten separate categories").

---

[11] A prosecutor's obligation to produce exculpatory information is not the same as the obligation to permit defendants to confront their accusers. The former is rooted in the due process clause of the Fourteenth Amendment, while the latter rests on the Sixth Amendment. See 6 Wayne R. LaFave et al., Criminal Procedure, §24.3(b) (4th ed. 2021) (noting the justices in United States v. Bagley, 473 U.S. 667 (1985) agreed that any constitutional violation regarding the failure to disclose particular information should be judged under the due process standard of Brady v. Maryland, 373 U.S. 83 (1963) rather than the Sixth Amendment's confrontation clause). We note only that Rule 3:13-3 is a precise enough standard to serve as a clear mandate of public policy, not that it bears any substantial nexus to plaintiff's claims.

Plaintiff does not appear, however, to have proffered that Rule to the trial court, which did not consider Rule 3:13-3 as a source of authority for the public policy mandate it identified of "upholding the rights of an accused to confront witnesses against them" and thus did not consider whether it bore the requisite "substantial nexus" to plaintiff's claim, viewing the evidence in the light most favorable to him as required by Rule 4:46-2(c). See Hitesman, 218 N.J. at 31.

In his statement of undisputed material facts on the motion, plaintiff claimed he didn't know and could "only speculate" as to Shapiro's reasons for "purposely stalling" the investigation into Sanchez. Leaving aside whether that circumstance could support any objectively reasonable belief on plaintiff's part about Shapiro's conduct, plaintiff claims he relied on Pacitto's "opinion" and "guess" at the time that Shapiro was delaying the investigation into Sanchez because Sanchez "gave information on the people that [Shapiro] was prosecuting," implying Shapiro was delaying the investigation into Sanchez in order to avoid having to provide potentially exculpatory information to defendants in other cases. Plaintiff, however, provided no details about those other cases. He did not identify the standard governing Shapiro's discovery obligations to the defendants involved or discuss the circumstances supporting

31

an objectively reasonable belief that Shapiro's conduct was incompatible with

the applicable standard.[12]

---

[12] Plaintiff's reliance on <u>Maimone</u>, 188 N.J. at 229-32, and <u>Turner</u>, 396 N.J. Super. at 590-91, is misplaced as neither case supports allowing the sort of generalized public policies cited by the trial court to anchor a CEPA claim. The Court in <u>Maimone</u> found the provisions of the Code of Criminal Justice prohibiting the promotion of prostitution and restricting the location of sexually-oriented businesses constituted a clear mandate of public policy under N.J.S.A. 34:19-3(c)(3), which the City was not free to ignore by adopting an alleged policy decision to terminate all enforcement of them. 188 N.J. at 233. The facts here are significantly different as plaintiff's allegations center on the conduct of only a single investigation.

In <u>Turner</u>, the plaintiff objected when a dog, which had been surrendered to his animal-shelter employer with the agreement the employer would "keep the dog under observation for ten days, then euthanize, and cremate it," because it had bitten its former owner, was instead placed "back into the pool of adoptable animals" and "adopted out to . . . an elderly woman." 396 N.J. Super. at 587-88. Nine days later, the dog attacked the new owner, "causing her to bleed to death on her bedroom floor." <u>Id.</u> at 589. The court noted:

> With respect to the clear mandate of public policy, our Legislature has recognized the serious and widespread threat that unprovoked dog attacks pose to the safety and welfare of our citizens and accordingly has adopted a comprehensive scheme prescribing various requirements for dogs that are found to be vicious or potentially dangerous, ranging from humane destruction to mandatory licensure of such dogs. N.J.S.A. 4:19-17. Moreover, in adopting our "dog bite" statute, N.J.S.A. 4:19-16, the Legislature imposed absolute liability on owners who knew of the animal's propensity to cause injury, and held those owners not aware of their animal's dangerous tendencies to the

32

The record suggests, but not does specify, that the other cases Pacitto referred to involved defendants alleged to have perpetrated the January 2010 home invasion robberies for which Sanchez was also ultimately convicted. Those defendants, however, were not indicted until February 2012, after Sanchez's arrest. Rule 3:13-3, the source plaintiff now relies on for the mandate of "upholding the rights of an accused to confront witnesses against them," makes clear a prosecutor has no pre-indictment discovery obligation unless "the prosecutor has made a pre-indictment plea offer." R. 3:13-3(a).

---

> ordinary negligence standard. DeRobertis v. Randazzo, 94 N.J. 144, 156 (1983). In addition, the State Department of Health has been authorized to promulgate rules and regulations governing the operation and maintenance of kennels and shelters. N.J.S.A. 4:19-15.14. Pursuant thereto, the Department specifically inspects for the improper handling of biting animals and the biting records of animals destroyed.
>
> [Id. at 595-96.]

The court held that "[c]ollectively, these laws and regulations are closely related to the complained-of conduct at hand" and established the requisite "clear mandate of public policy concerning the public, health, safety or welfare." Ibid. Instead of supporting plaintiff's position here, the Turner court's reasoning actually undercuts it because the standard of conduct imposed for dealing with potentially vicious dogs was a clear one against which the shelter's conduct of ignoring a specific dog's known biting history could be measured.

A-0131-20

Plaintiff appears to have made no attempt on the summary judgment motion to identify for the court the Rule he now claims gives rise to the clear mandate of public policy he asserted and no attempt to explain how Shapiro's alleged delay in the gang investigation targeting Sanchez was incompatible with either its letter or spirit as to any specifically-identified defendants. As plaintiff failed to provide the court with any basis to identify a clear mandate of public policy with which the Department and the Prosecutor's Office's conduct was incompatible or any facts establishing a substantial nexus between his claim that Shapiro delayed the gang investigation and that clear mandate, summary judgment should have been awarded to defendants on the delay claim.

Plaintiff's claim based on the Prosecutor's demand and the Department's request that he alter the supplementary reports Shapiro asked him to prepare about the 2010 robberies and his interview of Sanchez's daughter, by removing any mention of Sanchez and any reference to the confidential investigation, suffers from the same flaws. Although a demand that a police officer alter an official report by removing something from it may appear at first glance suspect,

we can readily imagine circumstances where such would be utterly innocuous or even required by regulation or standard operating procedure.[13]

The obligation was on plaintiff to establish he reasonably believed the Prosecutor's direction was incompatible with a clear mandate of public policy. Hitesman, 218 N.J. at 29. It was thus incumbent on him to identify the source of authority for that mandate and how it defined acceptable and unacceptable practices guiding the prosecutor and the Department in their review of his supplementary reports. See Chiofalo, 238 N.J. at 544 (distinguishing "criminal" or "fraudulent" activity alleged under section 3(c)(2), because often commonly recognizable, from claims asserted under sections 3(c)(1) and (3) alleging "violations of a more general 'law, or a rule or regulation promulgated pursuant to law' or of 'a clear mandate of public policy,' which can be more obscure").

---

[13] For example, under N.J.R.E. 516, "[a] witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this State or of the United States." The privilege permits the State to "decide[] when 'to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" State v. Sessoms, 413 N.J. Super. 338, 343 (App. Div. 2010) (quoting Roviaro v. United States, 353 U.S. 53, 59 (1957)). "The purpose of [the] secrecy" afforded under the Rule "is twofold — to protect the safety of the informant and to encourage the process of informing." Ibid.

Plaintiff's failure to identify, on the motion, the specific legal or ethical standard against which the Department and the Prosecutor's Office's conduct in demanding he alter his reports could be measured, making it impossible to determine whether his objection to modifying the reports — his refusal "to perjure [him]self because [the Prosecutor and the Department] wanted [him] to leave something out for their interests," and that "legally, in discovery, the defendants are entitled to this information" — had any substantial nexus to the standard, is fatal to his CEPA claim based on his alleged protected activity in refusing to alter his supplementary reports.

We note for sake of completeness that we have considered Vineland's argument that prosecutorial discretion should have barred plaintiff's claim. While we are not unmindful of the prosecutor's "wide discretion to charge or not to charge persons suspected of criminal offenses," which implicates both separation of powers and the fact "that the decision to prosecute is particularly ill-suited to judicial review," State v. Di Frisco, 118 N.J. 253, 265-66 (1990) (quoting Wayte v. United States, 470 U.S. 598, 607 (1985)), we have no need to consider any claim of prosecutorial discretion here as plaintiff's CEPA claims are not actionable under existing controlling precedent.

A-0131-20

We reverse the order denying summary judgment and remand for entry of an order granting summary judgment to Vineland dismissing plaintiff's CEPA claim. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0131-20